Georgе G. Higbee and Frances N. Schlapp, Plaintiffs, Appellants, v. M. A. Walsh and C. H. Walsh, Defendants, Appellees; Catherine M. Walsh, Executrix, substituted Defendant.

No. 45159.

NOVEMBER 12, 1940.

REHEARING DENIED MAY 16, 1941.

Clark, Hale & Plock, Havner, Flick & Powers, and Margaret I. Cunningham, for appellants.

Hirsch, Riepe & Wright, LaMonte Cowles, and Lane & Waterman, for appellees.

HAMILTON, J.—This is an acton at law to recover damages for alleged fraud and deceit. The case comes to us on the pleadings. The trial court sustained a demurrer to the petition on the ground that the cause of action was barred by the statute of limitations. This presents the only issue in the case.

The petition is quite lengthy, but, in substance, shows that four brothers, E. C. Walsh, J. W. Walsh, C. H. Walsh, and M. A. Walsh, and Colonel George H. Higbee, about the year 1895, associated themselves together in a joint adventure in the utility business in eastern Iowa in the cities of Burlington, Clinton, and Davenport, and surrounding territory, the nature of which, in its inception, is disclosed by a written proposition, a copy of which is attached to the petition and designated in the record as Exhibit C, which reads as follows:

"Proposition.

"Col. Higbee :-

".We the undersigned, propose that should you desire to purchase a portion of the stock, amount to be agreed upon between us, in the Burlington Electric Lighting Company, of Burlington, Iowa—said stock is fully paid and non-assessable—You shall have the right to a proportionate amount of the stock in the Burlington Gas and Fuel Company on the ground basis of the same, and also have a right to the same proportion of stock in the Burlington Street Railway Company—in case we come into control of said stock and shall share your proportion according to the amount of stock in the profits arising from the

manipulation of the said companies from whatever source the same shall be derived—so long as we control said properties.

"We further propose that whenever we shall desire to sell out our interest in said properties, or any of them, that your interest shall be offered at the same price or prices as we are to receive for ours, and in case you shall desire you shall have the right either by yourself or your heirs to purchase our interest in said stock at the price that we are to receive for our interest to any purchaser, and at the same price which we are to pay you in case of sale.

"The intention being that said Col. Higbee shall pro-rate to the amount proportionate with the said stock taken with all the profits of said properties, proportionate as aforesaid to the amount of stock held.

"Intention being that said Walsh Bros. shall have the management of said property and shall make the most out of the same that they can by and with the advice of said Col. Higbee. A bond of honor shall also be entered into by Walsh Bros. that they will in all ways protect the interest of said Col. Higbee whether held by himself or his heirs—and shall in no manner directly or indirectly manipulate said properties, or any of them so as to depreciate the value of said Col. Higbee's interest therein. Nothing herein shall be construed to mean that said Walsh Bros. shall not have the management of said property, but that they shall manage the same as in their best judgment seems fit, and that said Higbee shall receive his just proportion of the profits thereof.

"To be accepted by Jan. 22, 1895.

"All of which is respectfully submitted.

"E. C. Walsh,
"C. H. Walsh,

"Jan. 22, 1895
"20,000 taken today
"Option 30,000 @ 40
"Until March 1, 1895.
"E. C. Walsh."

It is further alleged that, by virtue of said written proposition and in response thereto, the said George H. Higbee, in the year 1895, invested funds in various corporations, some of

which, with the number of shares owned in each, are named and described in the petition; others of which are named or described in the petition, with the general allegation that the exact amount invested and the exact names and descriptions of the various utility companies or corporations are unknown to the plaintiffs but which were known and readily ascertainable by the defendants. All of said corporations, companies or properties were under the complete and absolute dominion and control of C. H. Walsh and M. A. Walsh, both being members of the board of directors thereof—the said C. H. Walsh being manager and chief executive officer of all said properties —and were such during all the years intervening between the investment of funds in stock of said companies by said Colonel Higbee under said written proposition and the year 1926, and during which time said Walsh brothers were in the control, management and manipulation of said corporations and of the properties thereof; that Colonel Higbee died testate in 1918 owning a one-fourth interest in said properties and by his last will and testament devised all his property to his wife, Frances Nealley Higbee, and, by virtue of which, she became invested with said one-fourth interest; that in 1924 a contract or contracts in writing were entered into for the sale of a greater part of said properties to ''George M. Bechtel & Company and/or Iowa Southern Utilities Company'' for the agreed consideration of a sum in excess of $3,500,000, the exact amount unknown to plaintiffs but known to defendants, a part of which was discharged by assumption of debts but of which the sum of $1,905,490.41 was paid in cash before the end of the year 1925; that the said M. A. Walsh and C. H. Walsh negotiated said sale and knew the terms thereof and the payments received; that, in the year 1926, said M. A. Walsh and C. H. Walsh, together with their brothers, E. C. Walsh and J. W. Walsh, both now deceased, and said Frances Nealley Higbee owned all the stock of said various companies and corporations; that said M. A. Walsh and C. H. Walsh conspired with each other and with their said brothers to defraud the said Frances Higbee of her right and equity in said companies and in the proceeds of such sale and designed to violate their duties as said officers of said corporations to the said Frances Higbee

by concealing from her the terms of said sale and payments made thereunder and to violate the obligation of the aforementioned proposition to protect the interest of the said Colonel Higbee against depreciation in its value whether held by him or his heirs and so, conspiring and designing, the said M. A. Walsh and C. H. Walsh sought to procure for said corporations and through said corporations for themselves and their said two brothers the stock and interest of said Frances Higbee; that said Frances Higbee never handled any of the business relating to such stocks or properties; that George G. Higbee was the agent and representative of his mother; that, knowing said plaintiff to be such agent, the said C. H. Walsh and M. A. Walsh, conspiring and designing as aforesaid, falsely and fraudulently told the said agent that all such properties in which his mother was interested had been sold for a cash consideration of $500,000; that, on or about the first day of August, 1926, the said C. H. Walsh told the said George G. Higbee that, after deducting obligations from the sum received and upon proper calculation, the share of his mother in said properties was $85,000; that delay had been due to his brothers; that M. A. Walsh was not in town that day but that he, the said C. H. Walsh, had bonds of the value of $85,000 which he was willing to give to said Higbee but that it would be necessary for said Higbee to act that day. There was accordingly delivered to him bonds as aforesaid. Whereupon, said C. H. Walsh told said agent that without the good work of the said C. H. Walsh the matter would not have been cleaned up and that he felt the said Higbee owed him a commission of $10,000. Higbee agreed to such request and paid over the said $10,000 to said C. H. Walsh. Thereupon, said George G. Higbee, being still without knowledge of the facts or the truth and still believing the statements aforesaid of said C. H. Walsh and M. A. Walsh and relying thereon and being still deceived and actuated thereby, executed and delivered in behalf of his mother a written contract or release and assignment of the stock and interest of his mother in said corporations and properties; that in truth and in fact there were properties remaining and not sold in said sale of a reasonable value in excess of $200,000 which were retained by said corporations;

that in truth and in fact, upon proper distribution of the funds and properties of said corporations, the said Frances Higbee would have been entitled to one fourth of the said sum of $1,905,490.41 and to one fourth of the value of the properties unsold and retained; that, by reason of the written proposition, Exhibit C, and the investments made by the said George H. Higbee in response thereto, as previously alleged, and that as such officers of said corporations, the said M. A. Walsh and C. H. Walsh bore a fiduciary relationship and held positions of trust toward said Frances Higbee, as a stockholder thereof, and were obliged to speak truthfully to her agent concerning the condition and affairs of the corporations and to fully reveal and disclose the terms and conditions of said sale and extent of the properties sold and retained in making distribution of the assets of said corporations and for themselves; that the said M. A. Walsh and C. H. Walsh were intimate friends of long standing with said Frances Higbee and her agent, George G. Higbee; that the said C. H. Walsh had lived for a long time in the home of the said Colonel George H. Higbee with said Frances Higbee and these plaintiffs; and that the said Frances Higbee and her agent reposed implicit confidence in the said M. A. Walsh and C. H. Walsh and in their management of the affairs of said corporations and relied implicitly upon the statements made by them in relation to such enterprises, the terms and conditions of the sale, the extent and character of the properties sold, the obligations and financial condition of said corporations; that neither the said Frances Higbee nor her agent, George G. Higbee, had ever been active in the management of the properties or affairs of said companies and that neither had knowledge of the extent or character of the properties and debts of such corporations or of the extent of the properties sold nor that properties were retained by the corporations or the terms and conditions of the sale, the amount of the consideration paid in cash or whether there were debts of the company or the amount thereof; that the representations aforesaid were false, known by each of the defendants when made to be false, made with intent to deceive said agent and to defraud the said Frances Higbee and were made for the purpose and with the design

that they should be believed, relied upon and acted on by said agent; that, having no knowledge of such facts, said agent believed the false and fraudulent representations, was deceived thereby and acted as aforesaid in agreeing to the disposition of the assets and division of the funds and in executing the written contract or release and assignment of shares of stock all because of such misrepresentations and in reliance thereon; that, because thereof, said Frances Higbee and her agent believed themselves truly informed concerning the properties involved, the terms of the sale and all other facts and circumstances pertaining to the adjustment of the affairs with said ''conspirators''; relying on the representations made by defendants and that they would perform the written obligations of the proposition, Exhibit C, and would respect the trust and confidence reposed in them by the acceptance of said written proposition by said Colonel George H. Higbee, as above alleged, and relying upon said misrepresentations, made no subsequent investigation to learn whether fraud had been practiced upon them by said ''conspirators''; that, by fraudulently securing the assignment of said stock certificates, defendants cut off said Frances Higbee and these plaintiffs from the sources of information in relation to the aforesaid matters that were open to stockholders of said corporations; that neither the said Frances Higbee nor either of the plaintiffs had any source of information concerning said matters other than said ''conspirators'' who at no subsequent time gave them or either of them any information in relation to such matters and that, by the misrepresentations hereinbefore set forth and by their silence and failure to reveal the truth, the said M. A. Walsh and C. H. Walsh fraudulently concealed the said fraud practiced by them upon said Frances Higbee and of the existence of the right of action to recover therefor; that said Frances Higbee never learned of said fraud and that neither plaintiff learned thereof prior to the year 1935; that, at all times material hereto, the defendant M. A. Walsh knew the facts alleged in paragraph 4-a of amendment to petition (this is the paragraph in which Exhibit C is set out) as well as the facts hereinbefore alleged. It is further alleged that in order that the said Frances Higbee might not be able to ascertain

from the inspection of the books and records of the corporations in which she held an interest, as hereinbefore alleged (and other material facts narrated), the said "conspirators", subsequent to the sale of the properties, caused incomplete records of the funds and properties of said corporations to be kept by the accounting employees and fraudulently withheld from such accounting officers information had by them alone as to the sums received in cash and of the uses being made thereof, for the purpose of deceiving and misleading the said Frances Higbee and the plaintiffs; that the falsification of the said books and records was so caused to be made by said "conspirators" pursuant to and in furtherance of the conspiracy as hereinbefore alleged and making it impossible to discover the fraud practiced upon the plaintiffs and Frances Higbee and for the specific purpose of fraudulently concealing said cause of action; that the exact items which were withheld from entry in said books and the exact records falsified plaintiffs cannot specifically state, but all of said facts are within the knowledge of the defendants and readily ascertainable from the records in the possession of defendants and inaccessible to plaintiffs. It is further alleged that plaintiff George G. Higbee had frequent contacts with said C. H. Walsh subsequent to said sale in connection with the securities conveyed and delivered as agent for his mother and had social contacts with said C. H. Walsh, exact dates and times plaintiffs cannot more specifically state; that the said C. H. Walsh, pursuant to said conspiracy as alleged and in furtherance thereof, frequently reiterated on such occasions to the said George G. Higbee, in substance and effect, the said misrepresentations in relation to the amount of said cash received and told the said George G. Higbee that he had made a very judicious disposition of his mother's interest, which representations were made to lull said Frances Higbee and these plaintiffs into a sense of security and to forestall and prevent an investigation of the facts concerning the sale or learning of this cause of action; that, by reason of the premises, neither of the plaintiffs nor the said Frances Higbee learned of the fraud practiced upon them nor of this cause of action until the month of February 1935, as hereinbefore alleged; that, by reason of all the things alleged,

neither the said Frances Higbee nor either of the plaintiffs could, by the exercise of reasonable diligence, have earlier learned of said fraud practiced by the defendants or learned of the cause of action. The petition further alleges that the purchaser, George M. Bechtel, prior to the time the assignment of the stock certificates and release was executed, as hereinbefore alleged, advised the plaintiff George G. Higbee that the cash portion of the purchase price of said properties was $500,000; that M. A. Walsh and C. H. Walsh had also represented and stated that the consideration was $500,000 and that there was no other source of information open from which it could be ascertained by either plaintiffs or their mother as to what actual cash consideration was paid and neither of said parties had such information until on or about the month of February 1935.

That, in the month of February 1935, George Claussen, an attorney at law (a former member of this court), engaged in the practice of law at Clinton, Iowa, called upon the plaintiff George G. Higbee in his office in the city of Burlington, Iowa, in search of information for use in connection with litigation pending in the Clinton county district court involving the affairs of M. A. Walsh and C. H. Walsh and their deceased brother, E. C. Walsh; that, in this conversation, said Claussen stated that the said properties hereinbefore referred to had been sold for a consideration that required the payment of between $1,800,000 and $1,900,000 in cash and that said purchase price was not $500,-000, and that shortly thereafter said Claussen again called upon said Higbee in further search of information and brought with him what purported to be an auditor's statement which he permitted said Higbee to examine; that such information so obtained from said Claussen was the first information that had ever come to either plaintiff that the cash portion of the purchase price of said properties was other or different than that stated by the said M. A. Walsh and C. H. Walsh. (It perhaps should be stated that throughout the lengthy petition, it is frequently reiterated that facts more definite and certain cannot be alleged by the plaintiffs but that all such facts are in the possession or easily ascertainable by the defendants.)

The prayer of the petition is for $730,211.54 with interest,

which sum is made up of one fourth of what is alleged to have really been paid in cash, $1,905,490.41, and one fourth of the $200,000 property retained and unsold plus interest thereon less a credit of $75,000 which had been received. The petition also contains allegations to the effect that plaintiffs, as the children of Colonel George H. Higbee and Frances Nealley Higbee, are now, by reason of the fact that they are residuary legatees, under the last will and testament of Frances Higbee, who died in 1927, the sole and only parties interested in this claim.

On April 13, 1939, M. A. Walsh filed his demurrer to the petition as finally amended on the ground that said petition as amended shows on its face that plaintiffs' cause of action is barred by the statute of limitations because:

"A. Said petition as amended discloses that the action was commenced more than five years after the alleged perpetration of the fraud complained of and the consummation of the transaction out of which the claim of the plaintiffs for damages arose.

"B. Said petition as amended fails to show facts legally sufficient to have prevented the running of the statute of limitations, in that:

"1. The facts pleaded are insufficient to constitute fraud or actual concealment such as is a prerequisite to relief from the bar of the statute of limitations.

"2. The facts pleaded are insufficient to show that M. A. Walsh by fraud or actual fraudulent concealment, prevented plaintiffs or Frances Nealley Higbee from discovering the alleged fraud or the existence of the cause of action during the period within which the action might have been brought.

"3. The facts pleaded are insufficient to show that C. H. Walsh by fraud or actual fraudulent concealment, prevented plaintiffs or Frances Nealley Higbee from discovering the alleged fraud or the existence of the cause of action during the period within which the action might have been brought.

"4. The petition as amended does not show that the alleged acts of fraudulent concealment were committed at such time as would render them operative to avoid the bar of the statute of limitations.

"5. There is no showing that the action was commenced

within five years after the existence of the cause thereof could have been discovered by the exercise of diligence.

"6. The petition as amended fails to show diligence on the part of the plaintiffs or Frances Nealley Higbee, but on the contrary shows that they slept on their rights for more than nine years and made no effort whatever to discover the alleged fraud.

"7. The facts pleaded in the petition as amended are insufficient as justification or excuse for the want of diligence.

"8. The petition as amended shows no sufficient reason why the alleged fraud was no sooner discovered and shows that no effort was ever made to discover it.

"9. The facts pleaded in the petition as amended are insufficient to show such concealment as would prevent a person exercising due diligence from discovering the facts and what constitutes diligence is a question of law to be determined by the Court from the petition and is not established by the mere statement of a conclusion of law.

"10. From the petition as amended it is impossible to determine whether or not plaintiffs could have discovered the alleged fraud and the existence of their cause of action more than five years before the commencement of this action, by the exercise of reasonable diligence.

"C. The Court has heretofore sustained demurrers to plaintiffs' pleadings prior to the amendment of April 3, 1939, and the new matter alleged in said amendment is insufficient to have prevented or postponed the running of the statute of limitations, in that:

"1. The allegations of said amendment make no additional showing of diligence on the part of plaintiffs.

"2. The properly pleaded allegations of said amendment as distinguished from mere conclusions of the pleaders are insufficient to show that the action was commenced within five years after the existence of the cause thereof could have been discovered by the exercise of diligence, and add nothing to the showing which has heretofore been held insufficient.

"3. The properly pleaded allegations of said amendment as distinguished from mere conclusions of the pleader are insufficient as justification or excuse for the want of diligence

and add nothing to the showing in that regard which has heretofore been held insufficient.

"4. There is no statement in said amendment of April 3, 1939, of any fact that would toll the running of the statute.

"There is no showing of any attempt made by the plaintiffs to discover any fact that might have tolled the statute.

"There is no statement of any act of diligence on the part of the plaintiffs to discover any fact that has or could have tolled the statute."

The defendant Catherine M. Walsh, executrix, also filed a demurrer based upon the same grounds and setting up practically the same reasons in support thereof as are contained in the demurrer of the defendant M. A. Walsh, which demurrers were, on September 1, 1939, sustained, and the plaintiffs having refused to plead further and having elected to stand on their pleadings, it was ordered and adjudged that plaintiffs' petition be dismissed. Judgment was entered against plaintiffs for costs and the appeal is from the final judgment and order sustaining defendants' demurrers to plaintiffs' petition as amended and from each and every ruling adverse to the plaintiffs during the progress of the above-entitled case.

Appellants contend the court erred in failing to overrule the demurrers and in not holding that, under Exhibit C and the allegations of the petition, a fiduciary relationship existed between the parties and that mere silence on the part of the defendants and their failure to reveal the truth tolled the statute of limitations until the plaintiffs actually discovered the fraud for the reasons:

A. Defendants sustained a position of trust and confidence toward plaintiffs, and, because of such relationship, a mere failure to speak by the wrongdoers tolled the statute of limitations.

B. The relationship which existed between the plaintiffs and defendants, by virtue of Exhibit C, was in effect a joint adventure or trust agreement, not only as to the original money invested but as to all profits which should be derived through manipulation of the companies and all sales of the property, and there was thereby created a fiduciary relationship between plaintiffs and defendants in which the mere silence of the wrongdoers would toll the statute of limitations.

C. Under the facts alleged, defendants were agents to manage and control the properties and to handle the money invested by Colonel Higbee and thus a fiduciary relationship was created between Colonel Higbee and his heirs and the defendants and, therefore, mere silence on the part of defendants would toll the statute of limitations.

That C. H. Walsh demanded, received and accepted $10,000 as commission from Mrs. Higbee for services in connection with the transaction whereby she was paid $85,000 for her interest and equity as alleged in the petition and, by said act, was the agent of Mrs. Higbee and the plaintiffs and was required to make full disclosure of all the facts to his principal, and his failure so to do constituted a continuing fraud as against the plaintiffs which tolled the statute.

In appellees' own words, their position is this:

" * * * it is the recognized rule in Iowa that if a fiduciary relationship exists which makes it the duty of the defendant to speak, mere silence on his part may constitute or take the place of fraudulent concealment and no affirmative acts are necessary to postpone the running of the statute to the time of discovery or the time when discovery should have been made in the exercise of diligence.

"There is no real dispute between appellants and appellees as to these rules. Where they differ is in their application. Appellants' position below, and it appears to be the same here, is that where a fiduciary relationship *has* existed, mere silence is sufficient. Appellees contend that the fiduciary relationship must exist *at the time* when it is claimed the statute is to be considered tolled; that there is no difference between a cause of action founded upon constructive fraud or a duty to make full disclosure because of a fiduciary relationship and any other cause of action. The thing which will toll the statute must occur or exist *after the cause of action arises,* and if that *thing* is founded upon a fiduciary relationship, such relationship must *exist* or *continue* after the cause of action comes into existence. It is appellees' contention that whatever fiduciary or quasi fiduciary relationship may have existed between C. H. Walsh and M. A. Walsh, or either of them, and Colonel Higbee or his heirs terminated August 1, 1926, when the Higbee interest in the enterprises

was sold, and thereafter there was no fiduciary relationship and no longer any duty to speak and mere silence was insufficient to constitute fraud or actual fraudulent concealment.

" * * * The relationship ceased when the interest which the Walshs may have been bound to protect was disposed of and thereafter no duty of disclosure existed and the cause of action, predicated in part upon the fiduciary relationship, is barred by. the statute of limitations unless there was some affirmative act constituting fraud or actual fraudulent concealment after the cause of action arose." (Italics appellees.)

As we understand the decisions of our court, they do not support appellees' theory in its entirety.

■ The purpose of the statute of limitations is said to be twofold: (a) penalty for laches and (b) protection against stale claims, the latter as a shield against fraud. The efficiency of the law in accomplishing the legislative purpose will manifestly depend upon the degree of strictness applied by the courts in the enforcement thereof. In actions based on fraud, whether brought in law or equity, the legislative branch of our government, as well as the courts of this country, have evolved some special rules which are intended to prevent the statute from being converted into an instrument of fraud.

■■ Subdivision 5 of section 11007, Code of 1939, provides that " * * * actions * * * for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery" may be brought within five years after the cause of action accrued. Section 11010 of the Code provides:

"In actions for relief on the ground of fraud * * * the cause of action shall not be deemed to have accrued until the fraud * * * complained of shall have been discovered by the party aggrieved."

By judicial interpretation, the fraud referred to in the last section has been held to relate to such as gave rise to a cause of action heretofore, at common law, solely cognizable in equity. In such actions, the statute of limitations is tolled until the fraud is discovered. This rule has no application to the case at bar, it being one at law to recover a money judgment for damages for fraud and deceit. However, in addition to this

statutory provision for tolling the statute, the courts have developed what is termed the common law "Doctrine of Fraudulent Concealment", first taken notice of by our court in District Township of Boomer v. French, 40 Iowa 601, 603, which holds that:

" * * * where the party against whom a cause of action existed in favor of another, *by fraud or actual fraudulent concealment* prevented such other from obtaining knowledge thereof, the statute would only commence to run from the time the right of action was discovered, or might, by the use of diligence, have been discovered." (Italics ours.)

Under this doctrine, two things must be alleged: (1) that the party against whom the cause of action exists did some affirmative act to conceal the cause of action, and (2) that plaintiff exercised diligence to discover the cause of action. The rule has been recognized and applied by this court in numerous cases. Findley v. Stewart, 46 Iowa 655; Pullan v. Struthers, 201 Iowa 1179, 207 N. W. 235; Smith v. Middle States Utility Company, 224 Iowa 151, 275 N. W. 158; and many others. We said in Smith v. Middle States Utility Company, supra [224 Iowa 151, 157, 275 N. W. 158, 162]:

"It has frequently been held by this court that the provision of section 11010, that the statute shall not commence to run in cases of fraud until the fraud is discovered by the party aggrieved, is confined to cases where relief on the ground of the fraud involved was solely cognizable in a court of chancery prior to the adoption of the statute; that an action at law for damages growing out of fraud or deceit is not such an action as was solely cognizable in chancery prior to the adoption of the statute; and that the provision of section 11010 would not, therefore, apply to such actions. McGinnis v. Hunt, 47 Iowa 668; McKay v. McCarthy, 146 Iowa 546, 123 N. W. 755, 34 L. R. A. (N. S.) 911; Birks v. McNeill, 185 Iowa 1123, 170 N. W. 485.

"It is true that there is a line of cases holding that a plaintiff, who has suffered damages because of the fraud and deceit of a defendant, may nevertheless prosecute his action for such fraud and deceit after five years from the date on which the cause of action accrued; but, *when there is no relation of con-*

*fidence or trust,* such holding is confined to cases where the defendant has been guilty of some affirmative act by which he fraudulently concealed the fraud and deceit out of which the cause of action for damages arose. District Township of Boomer v. French, 40 Iowa 601; Wilder v. Secor et al., 72 Iowa 161, 33 N. W. 448, 2 Am. St. Rep. 236; Cress v. Ivens, 155 Iowa 17, 134 N. W. 869; Pullan v. Struthers, 201 Iowa 1179, 207 N. W. 235. Moreover, in order that the fraudulent concealment of the fraud and deceit out of which the damages arose may toll the running of the statute, it must be both pleaded and proved.'' (Italics ours.)

 Where a confidential or fiduciary relationship is present, the requirement that affirmative acts of concealment be alleged and proven is supplied by mere silence and diligence in discovering the fraud complained of is, likewise, greatly relaxed. In such cases, by virtue of the duty existing, because of such relationship, to reveal to the cestui que trust all facts which might affect his interest, the suppression or concealment of such facts by mere silence constitutes a concealment of the cause of action. We so held in Wilder v. Secor et al., supra [72 Iowa 161, 163, 33 N. W. 448, 449, 2 Am. St. Rep. 236], in which case we said:

''As plaintiff had the right to rely upon defendants to communicate the facts of the case to him, and, as they were under obligation to communicate them, they cannot be permitted to say that he might have discovered the existence of the cause of action at an earlier date than he did by an examination of the records * * *.''

This same rule was applied and the statute tolled in the case of Blakeney v. Wyland, 115 Iowa 607, 611, 89 N. W. 16, 17, between a guardian and wards. The wards lived in a distant state; proceeds from sale of land came into the hands of the guardian which he mingled with his own funds and lost; sometime later, long after the minors arrived of age, in objections filed to guardian's report, they asked that he be charged with the loss of this fund with interest. The guardian plead statute of limitations. We said:

"The relationship of guardian and ward is one of peculiar trust and confidence, and the guardian will be held to the strictest good faith in dealing with the ward or with his funds. The *suppression or withholding from his wards* of the fact of the existence of the moneys in his hands for their benefit must be treated as a fraud upon them, and prevents the running of the statute in his favor. Hoyle v. Jones, 35 Ga. 40 (89 Am. Dec. 273). This is true irrespective of the statutory provisions as to fraud and mistake. District Tp. of Boomer v. French, 40 Iowa, 601; Wilder v. Secor, 72 Iowa, 161." (Italics ours.)

This rule is clearly stated in Faust v. Hosford, 119 Iowa 97, 100, 93 N. W. 58, 59, a case involving the relationship of principal and agent, in these words:

"Where persons stand with reference to each other as principal and agent, and the agent commits an actual fraud upon the principal, mere silence upon his part amounts to a fraudulent concealment, within the rule above stated. In other words, his silence is regarded as a continuation of the original fraud, and *a concealment of the cause of action.* * * * [Citing cases.] And in such cases the *burden* is on the defendant to show plaintiff's knowledge of the fraud." (Italics ours.)

To the same effect, see Caffee v. Berkley, 141 Iowa 344, 118 N. W. 267.

In each of the last two cited cases—the former at law and the latter in equity, both based on fraud and deceit—it was held that they grew out of a fiduciary relationship and that the causes of action were such as were solely cognizable under the common law by a court of chancery. However, in Cress v. Ivens, supra, we held that whether or not this action fell within the undiscovered fraud statute was not a vital question where there was fraudulent concealment of the facts, there being a fiduciary relationship existing, and we further held, in this case, that there was no merit in the contention that the fraudulent act might have been sooner discovered by the use of diligence. We said [155 Iowa 17, 20, 134 N. W. 869, 870]:

"The defendants were acting in a fiduciary relation to their associates, and their repeated assurances to these plaintiffs

that they were not to receive any advantage over them in the purchase of the land justified the plaintiffs *in relying thereon,* even though they may have suspected a secret arrangement before such assurances were given.'' (Italics ours.)

Again, Pullman v. Struthers, supra, we said [201 Iowa 1179, 1181, 207 N. W. 235, 236]:

''The rule has been applied, where a fiduciary relation existed, to fraudulent concealment by mere silence.''

In this class of cases, the rule as to diligence is stated in Faust v. Hosford, supra, as follows [119 Iowa 97, 101, 93 N. W. 58, 59]:

''She had the right to rely on the statements of her trusted agent, and, until something arose which would put a reasonably prudent person on his guard, plaintiff was not negligent in failing to resort to the records.''

In a more recent case, Vertman v. Drayton, 223 Iowa 380, 383, 272 N. W. 438, 439, we said:

''Because of the fiduciary relationship existing between the parties, it was the duty of the defendant to act in the highest good faith and for the best interest of the appellant. Defendant was under a legal duty to fully and fairly disclose all the facts within his knowledge relative to the subject matter of the relationship and give to the appellant all information that would have tended to influence her conduct. The violation of this duty was a fraud on the plaintiff. The appellant was entitled to assume that the defendant would be loyal and faithful to her interests until she was advised that he was not worthy of her confidence and she was not bound to presume that he would defraud her.''

Applying the rule announced in the foregoing cases to the pleaded facts, we are impelled to hold that the trial courts in both instances were in error in sustaining the demurrers.

For nearly a quarter of a century, the Walsh Brothers and Colonel Higbee were associated together. This association had its inception in 1895 when the aforesaid proposition in writing, Exhibit C, was made. It speaks for itself. Its import is plain.

Stronger terms could scarcely have been used connoting trust and confidence. The Walsh Brothers were to be given complete control and management. Walsh Brothers invited Colonel George H. Higbee to make the investment of his money and they stated to him in writing that, if he should so invest his money, they would enter into a "bond of honor"; that they would faithfully perform what they promised not only to him but to his heirs. This "bond of honor" was to *"in all ways* protect the interest of said Col. Higbee whether held by himself or his heirs * * * and shall *in no manner* directly or indirectly manipulate said properties or any of them *so as to depreciate* the value of said Colonel Higbee's interest therein * * * and that said Higbee *shall receive* his just proportion of the *profit* thereof". (Italics ours.) After Colonel Higbee's death, the Walsh Brothers continued on in the management and control of these investments without let or hindrance for almost ten years longer. They had full control and were trusted implicitly. They went ahead and sold out the properties without even consulting the holders of the Higbee interest. Appellees point out that M. A. Walsh did not sign Exhibit C and this is true, but it is alleged in the petition that he had knowledge thereof and of the investments made under and by virtue thereof by the said Colonel Higbee and, if, with such knowledge, he conspired and confederated with his brothers, who were associated with him and who did sign the document, in the perpetration of the fraud and in the fruits thereof, he became a trustee ex maleficio and a joint tort-feasor equally culpable and as the statute did not run against his co-conspirators, neither would it run against him. Pennsylvania Co. v. Trust Co., 306 Pa. 148, 158 A. 251. By the terms of Exhibit C, an express declaration was made, which, when accepted and acted upon, created an obligation upon Walsh Brothers in favor of the obligee, Colonel George H. Higbee, and his heirs. One of these obligations was that Higbee "shall receive his just proportion of the profits". It was a voluntary self-imposed obligation of trust and confidence.

Appellees contend that any trust relationship or fiduciary relationship that may have existed between the parties ended with the transfer of the stock in the various corporations and in support of this cite and rely upon the case of Birks v. Mc-

Neill, supra. The facts in the McNeill case are easily distinguishable from the facts in the instant case. In that case, the relationship was purely that which exists between the officer of a corporation and a stockholder therein. The agent, who represented the owner of the stock, was in a position to have been and in fact was, so far as appears from the record, as fully cognizant of all the facts as the officer of the corporation who purchased the stock. The officer who purchased the stock did not say or do anything to deceive the agent of the seller. In fact, the agent took the initiative; the buyer simply accepted the option tendered him. Under such circumstances, the actionable fraud, as was held in that case, was concealment and the court's decision was to the effect that there was no concealment since the parties had equal access to the records and each was actually advised or in a position to be advised of all the material facts. The court also held in that case that the trust relationship which existed between officer and stockholder ceased with the sale of the stock. In reference to the rule announced in Boomer v. French, supra, Faust v. Hosford, supra, and Caffee v. Berkley, supra, we said [185 Iowa 1123, 1137, 170 N. W. 485, 490]:

"It is argued, however, that, under the ruling of the last cited cases, W. A. McNeill fraudulently concealed the cause of action until about the time this suit was begun. If this was done, it was by silence throughout this long period. But his relation of quasi trustee toward the shareholder ceased with the transaction, and he was under no more obligation to confess the wrong, if one were perpetrated, than any other wrongdoer. The omission to disclose the facts while the trust relation existed was of the essence of the fraud alleged to have been perpetrated. This duty to disclose was not a continuing one, and to say that McNeill's silence amounted to fraudulent concealment would wipe out the limitation, by ruling that the vital element of the alleged fraud tolled the statute, and rendered it possible to maintain an action at any time during the silence of the wrongdoer, though that were the wrong necessarily in connection with the sale of the stock making up the cause of action."

The writer of the opinion then points out the distinction between the cases last above cited and the McNeill case saying:

"In the cases last above cited, the agent had committed a fraud on his principal, and, of course, his silence as to what he had done was a continuing breach of the duty of disclosing to his principal what he had done."

For the same reason, the McNeill case is, likewise, distinguishable from the case at bar.

Mere silence is not the gist of the cause of action in the instant case. Misrepresentation of the amount received and the net amount available for distribution as Mrs. Higbee's share constitutes the actionable fraud and is the basis of the cause of action in the instant case. A wrong was committed by those acting in a capacity analogous to that of an agent to his principal or one member of a partnership to his copartner or members engaged in joint adventure. The false representations were made at a time when the duty was still owing to the principal to speak the truth and reveal the wrong which he had done. The silence with reference to the knowledge he possessed of the wrong he himself had committed was a concealment of the very basis of plaintiffs' cause of action. This concealment and suppression of the truth prevented the statute of limitations from commencing to run or as we say the statute was tolled. The agent's silence concealed the cause of action against himself. Against such conduct, the statute of limitations was never intended to operate. Why should one, who has full knowledge of all the facts and who is, in equity and good conscience, duty bound to reveal such facts to his principal, be heard to say that the claim against himself, because of his own wrong, is stale and that, by the long delay in bringing the action, such agent has lost his evidence or means of proof when the delay has been due to his own misrepresentations upon which, under the circumstances, because of the fiduciary relationship existing, the plaintiffs, acting as reasonably prudent persons, had a right to rely? In saying that one has a right to rely on another in whom he has placed trust and confidence does not mean that he may close his eyes to the obvious or throw prudence and diligence to the wind. To so place one's

confidence is not a violation of the general rule which demands of all competent persons that they use prudence and diligence in their business dealings, because, there is also another general and recognized rule that men, occupying fiduciary relationships, usually, may safely be trusted by their associates and do not ordinarily violate such trust and confidence. The rule really implies that, under such circumstances, one does not act imprudently, but is acting the part of a reasonably prudent person placed under like or similar circumstances. To hold otherwise would be tantamount to saying there is no such thing as loyalty and trustworthiness; and that one is never justified in placing his faith and trust in his business associates in relation to matters in which they have a common interest.

According to the facts alleged and which are taken as true, these trusted personal friends and business associates, who had entered into this pledge of honor, made false and fraudulent representations, knowing them to be false, intentionally made to deceive and to cheat the holders of the Higbee interest out of their just portion of the profits of this sale, under the circumstances set out in the petition. This was a fraud committed—a wrong perpetrated against persons whom they had solemnly promised to protect in all ways and that in no way or manner directly or indirectly would they manipulate said properties so as to cause any loss to said Higbee or his heirs. Defendants and the purchaser knew the real facts as to the purchase price. Those holding the Higbee interest had no knowledge. Under the circumstances revealed by the allegations of the petition and the fair inferences from said facts, plaintiffs and their mother, during her lifetime, were, of necessity, dependent for knowledge of the business upon the defendants, in all the transactions relating to the corporate properties. Plaintiffs would, therefore, have had no other way of ascertaining the truth except to demand an audit of the entire business extending over a long period of time. Defendants were not only silent as to matters concerning which it was their duty to speak the truth, they also sought to lull plaintiffs into a sense of security by repeating the false representations and by felicitations tending to impress the one being deceived with the wisdom of his conduct in making the sale of his mother's interest in the corporate properties. Nothing

appears in this record to which we can point indicating any reasonable ground or basis for the Higbees mistrusting the defendants in whom they had, for so many years, placed their trust and confidence in the management and control of the many corporations and properties in which they had their funds invested. It seems logical that a reasonably prudent person would, under the circumstances, be justified in believing and relying on the representations and should be held harmless in so doing.

Appellees say that plaintiffs had the same opportunity to ascertain the facts that Attorney Claussen had, but this is hardly a fair inference for Claussen was employed as an attorney in a matter between the brothers, giving him access to records which these plaintiffs would not have unless they too had distrusted the defendants and employed an attorney or an expert accountant and demanded the books and records. Of course, they had this right, but, under the circumstances, there was a fiduciary relationship existing and failure to resort to this method of ascertaining the truth should not be held to show a want of diligence on the part of plaintiffs.

Our court has spoken in no uncertain terms in holding that there exists between an officer of a corporation and a stockholder a fiduciary relationship. See Dawson v. National L. Ins. Co., 176 Iowa 362, 157 N. W. 929, L. R. A. 1916E, 878, Ann. Cas. 1918B, 230. In an annotation on the subject, ''Duty of officer or director of corporation toward one from whom he purchases stock'', found in 84 A. L. R. 615, all the cases are reviewed and, from this annotation, it would appear that our court is listed under the ''minority view''. This fact is taken notice of in the opinion in the Dawson case, in which we expressed ourselves as being convinced of the soundness of such rule. However, in the instant case, the relationship established and created by Exhibit C and the manner and method by which the business was carried on, as shown by the allegations of the petition, establish beyond question a far greater relationship of intimacy and friendship of trust and confidence between the parties than that ordinarily existing between an officer of a corporation and one of its stockholders. The written release or assignment which was executed at the time of the sale of the stock, very strikingly bears out this conclusion. The instrument was not attached to

the petition but is contained in the record. After specifically describing by name, number of certificate, and number of shares, the stock in the corporations which Frances N. Higbee was purporting to sell and convey to Peoples Gas and Electric Company of America, the instrument continues with the following blanket provisions:

"It is understood and agreed that the above sale and transfer is intended to and does include all the interest owned by Col. Geo. H. Higbee at the date of his death in the Electric Light properties, the Gas properties and the Street Railway properties located in Burlington and other Cities, towns and farm localities in the State of Iowa, and in the Rock Island Southern Railway property between Rock Island, Aledo, Monmouth and Galesburg, Illinois and includes all interest in Peoples Gas and Electric Company and Burlington Railway and Light Company.

"It is agreed also that this agreement of sale carries with it a settlement and assignment of *any and all claims against* the *old partnership* of *Walsh Brothers* and *the members* of the *Walsh family* and *Walsh Brothers Incorporated* and we assign to Peoples Gas and Electric Company of America all interest in the claims against any and all of the Corporation in which said Col. George H. Higbee was *associated with said Walsh Brothers or any of them."* (Italics ours.)

This instrument is signed by Frances N. Higbee, by George G. Higbee, attorney in fact, and bears the "okay" of Peoples Gas and Electric Company of America, by M. A. Walsh, President.

However, in view of the fact that the case may still be tried on its merits, we do not deem it advisable or proper to discuss the case further and it should be said, in this connection, that this discussion has been on the theory that the facts alleged are taken as true only for the purpose of considering the rulings on the demurrers.

For the reasons above indicated, the judgment of the trial

432

court in sustaining the demurrers should be and is reversed.—
Reversed.

RICHARDS, C. J., and SAGER, MILLER, BLISS, STIGER, and
OLIVER, JJ., concur.

HALE, J., takes no part.

MITCHELL, J., dissents.

MITCHELL, J. (dissenting)—The majority opinion, as I read
it, is based upon a fiduciary relationship, which it is claimed is
shown by Exhibit C, referred to as the "bond of honor". The
trouble with this contention is that M. A. Walsh never signed
Exhibit C; and I can find no reason why he should be held ac-
countable due to a written instrument which he never signed.